UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| VINZENZ J. KOLLER, an individual and Presidential Elector,<br><br>Plaintiff,<br><br>v.<br><br>JERRY BROWN, in his official capacity as Governor for the State of California, et al.,<br><br>Defendants. | Case No.  5:16-cv-07069-EJD<br><br>**ORDER DENYING PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**<br><br>Re: Dkt. No. 4 |

On Tuesday, November 8, 2016, the citizens of the United States cast their votes for the offices of President and Vice President. The Democratic candidates for those offices, Hillary Rodham Clinton and Timothy Kaine, "won the nationwide popular vote by at least 2.7 million votes, and won the California popular vote by a large margin." Dkt. No. 1, at ¶ 13. Yet, the Constitution does not permit Presidents and Vice Presidents to be chosen based on the outcome of the popular vote. They are instead selected by a group of individuals designated in each state, known as "electors," who together make up an Electoral College. The Electoral College chooses who will be President and Vice President, and if each state's electors vote consistent with the popular vote of their respective states on December 19, 2016, Donald J. Trump and Michael Pence will succeed to those offices.

This case involves a California elector, Plaintiff Vincenz J. Koller ("Plaintiff"), who believes it is his duty "to vote in the best interests of the state and nation" by selecting the persons he feels are "properly fit and qualified to become President and/or Vice-President." Decl., Dkt.

1

No. 4, at ¶ 10.  Such persons for the office of President may be "Mitt Romney, John Kasich, or another qualified compromise candidate" other than Trump.  Decl., Dkt. No. 30, at ¶ 3.  California law, however, requires that Plaintiff cast his electoral vote for Clinton and specifies a punishment if he does not.  Through this action, Plaintiff seeks to invalidate as unconstitutional the California statutes coercing his selection.

Presently before the court is Plaintiff's Motion for Temporary Restraining Order ("TRO") and Preliminary Injunction.  Dkt. No. 4.  Defendants Governor Jerry Brown, Attorney General Kamala Harris, and Secretary of State Alex Padilla (collectively, "Defendants") oppose the motion.  Dkt. Nos. 28, 29.  As do proposed intervenors California Republican Party, Donald J. Trump for President, Inc. and Trump himself.  Dkt. No. 27.  Having considered the relevant pleadings and arguments presented at the hearing on December 16, 2016, the court will deny Plaintiff's motion for the reasons explained below.

## I.  BACKGROUND

Plaintiff is a resident of Monterey County and an appointed elector of the California Democratic Party.  Decl., Dkt. No. 4, at ¶ 2.  He and all other members of the California Electoral College are due to "meet, deliberate and cast" votes in the election of the President and Vice President on December 19, 2016, at approximately 2:00 p.m.  Decl., Dkt. No. 30, at ¶ 2.  Plaintiff states that under current California law, specifically Elections Code §§ 6906[1] and 18002,[2] he is

---

[1] Elections Code § 6906 states:

> The electors, when convened, if both candidates are alive, shall vote by ballot for that person for President and that person for Vice President of the United States, who are, respectively, the candidates of the political party which they represent, one of whom, at least, is not an inhabitant of this state.

[2] Elections Code § 18002 states:

> Every person charged with the performance of any duty under any law of this state relating to elections, who willfully neglects or refuses to perform it, or who, in his or her official capacity, knowingly and fraudulently acts in contravention or violation of any of those laws, is, unless a different punishment is prescribed by this

2
Case No.: 5:16-cv-07069-EJD
ORDER DENYING PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

1   compelled to vote for the Democratic candidates for President and Vice President, Clinton and
2   Kaine, or face punitive sanctions. Decl., Dkt. No. 4, at ¶¶ 6-8.
3   But at the same time, Plaintiff believes it is his duty under the United States Constitution to
4   vote for the person who he believes will make the best President. Decl., Dkt. No. 30, at ¶ 3. He
5   has decided that "Mitt Romney, John Kasich or another qualified compromise candidate" may be
6   the "correct choice" for his vote. Id. However, Plaintiff is unwilling to vote for Romney, Kasich
7   or anyone other than Clinton because doing so may subject him to the penalties described in
8   Elections Code § 18002. Id. at ¶ 8.
9   Additionally, Plaintiff does not believe electors "should be required to ignore facts and
10  evidence that come to their attention" from the date of the election to the date of their vote. Decl.,
11  Dkt. No. 4, at ¶ 4. In particular, Plaintiff states that he and other electors "have learned that the
12  CIA has concluded with 'high confidence' that Russia sought to influence the U.S. election and
13  that President Obama and lawmakers in Congress have decided to conduct a bipartisan
14  investigation" into the matter. Id. Plaintiff believes that "ensuring that no one be put into the
15  office of the President or Vice-President that might be subject to foreign influence is part of the
16  Electoral College job." Id.
17  Plaintiff commenced this action December 9, 2016, and seeks a declaratory judgment that
18  Elections Code §§ 6906 and 18002 are unconstitutional as well as an injunction prohibiting
19  Defendants from enforcing the statutes against electors. The present TRO application followed on
20  December 12, 2016.

## II. LEGAL STANDARD

22  The standard for issuing a TRO is the same as that for the issuance of preliminary
23  injunction. See New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co., 434 U.S. 1345, 1347 n.2

---

code, punishable by fine not exceeding one thousand dollars ($1,000) or by imprisonment pursuant to subdivision (h) of Section 1170 of the Penal Code for 16 months or two or three years, or by both that fine and imprisonment.

(1977). Thus, much like a preliminary injunction, a TRO is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7, 22 (2008).

"To obtain a preliminary injunction, the moving party 'must establish that: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest.'" Idaho v. Coeur D'Alene Tribe, 794 F.3d 1039, 1046 (9th Cir. 2015) (quoting Pom Wonderful LLC v. Hubbard, 775 F.3d 1118, 1124 (9th Cir. 2014)).

Alternatively, "'serious questions going to the merits' and a hardship balance that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1135 (9th Cir. 2011). This articulation represents "one alternative on a continuum" under the "'sliding scale' approach to preliminary injunctions employed" by the Ninth Circuit. Id. at 1131-32. But "[t]he critical element in determining the test to be applied is the relative hardship to the parties." Benda v. Grand Lodge of the Int'l Ass'n of Machinists & Aerospace Workers, 584 F.2d 308, 315 (9th Cir. 1978). "If the balance of harm tips decidedly toward the plaintiff, then the plaintiff need not show as robust a likelihood of success on the merits as when the balance tips less decidedly." Id.

Whether to grant or deny a TRO or preliminary injunction is a matter within the court's discretion. See Miss Universe, Inc. v. Flesher, 605 F.2d 1130, 1132-33 (9th Cir. 1979).

### III.    DISCUSSION

#### A.    Plaintiff Has Identified a Serious Question

To satisfy the first element of the standard for injunctive relief, it is not necessary for the moving party to "prove his case in full" (Univ. of Tex. v. Camenisch, 451 U.S. 390, 395 (1981)), or show that he is "more likely than not" to prevail. Leiva-Perez v. Holder, 640 F.3d 962, 966 (9th Cir. 2011)). Instead, he must demonstrate a "fair chance of success on the merits" or raise

questions "serious enough to require litigation." Benda, 584 F.2d at 315.

Here, Plaintiff argues that Elections Code §§ 6906 and 18002 are unconstitutional because, by mandating that California electors cast their vote for their party's candidate or face penalties, they violate Article II, § 1 of the Constitution,[3] as amended by the Twelfth Amendment.[4] To

---

[3] Article II, § 1 of the Constitution describes the method for choosing the President and Vice President, and provides in pertinent part:

> Each state shall appoint, in such manner as the Legislature thereof may direct, a number of electors, equal to the whole number of Senators and Representatives to which the State may be entitled in the Congress: but no Senator or Representative, or person holding an office of trust or profit under the United States, shall be appointed an elector.
>
> The electors shall meet in their respective states, and vote by ballot for two persons, of whom one at least shall not be an inhabitant of the same state with themselves. And they shall make a list of all the persons voted for, and of the number of votes for each; which list they shall sign and certify, and transmit sealed to the seat of the government of the United States, directed to the President of the Senate. The President of the Senate shall, in the presence of the Senate and House of Representatives, open all the certificates, and the votes shall then be counted. The person having the greatest number of votes shall be the President, if such number be a majority of the whole number of electors appointed; and if there be more than one who have such majority, and have an equal number of votes, then the House of Representatives shall immediately choose by ballot one of them for President; and if no person have a majority, then from the five highest on the list the said House shall in like manner choose the President. But in choosing the President, the votes shall be taken by States, the representation from each state having one vote; A quorum for this purpose shall consist of a member or members from two thirds of the states, and a majority of all the states shall be necessary to a choice. In every case, after the choice of the President, the person having the greatest number of votes of the electors shall be the Vice President. But if there should remain two or more who have equal votes, the Senate shall choose from them by ballot the Vice President.
>
> The Congress may determine the time of choosing the electors, and the day on which they shall give their votes; which day shall be the same throughout the United States.

[4] The Twelfth Amendment modifies the manner in which the electors vote, and provides:

> The electors shall meet in their respective states and vote by ballot for President and Vice-President, one of whom, at least, shall not be

5

Case No.: 5:16-cv-07069-EJD
ORDER DENYING PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

1  understand why Plaintiff believes this is so, it is first necessary to examine documents that
2  preceded the Constitution and promoted its adoption.
3       In Federalist No. 68, Alexander Hamilton described the manner of electing a President "by
4  men chosen by the people for the special purpose" as, if not perfect, "at least excellent." He
5  believed it desirable to establish an Electoral College so the choice of the President "would be
6  made by men most capable of analyzing the qualities adapted to the station, and acting under
7  circumstances favorable to deliberation, and to a judicious combination of all the reasons and
8  inducements which were proper to govern their choice." Hamilton argued that a "small number of
9  persons, selected by their fellow-citizens from the general mass" would be "most likely to possess

---

> an inhabitant of the same state with themselves; they shall name in their ballots the person voted for as President, and in distinct ballots the person voted for as Vice-President, and they shall make distinct lists of all persons voted for as President, and of all persons voted for as Vice-President, and of the number of votes for each, which lists they shall sign and certify, and transmit sealed to the seat of the government of the United States, directed to the President of the Senate;--The President of the Senate shall, in the presence of the Senate and House of Representatives, open all the certificates and the votes shall then be counted;--the person having the greatest number of votes for President, shall be the President, if such number be a majority of the whole number of electors appointed; and if no person have such majority, then from the persons having the highest numbers not exceeding three on the list of those voted for as President, the House of Representatives shall choose immediately, by ballot, the President. But in choosing the President, the votes shall be taken by states, the representation from each state having one vote; a quorum for this purpose shall consist of a member or members from two-thirds of the states, and a majority of all the states shall be necessary to a choice. And if the House of Representatives shall not choose a President whenever the right of choice shall devolve upon them, before the fourth day of March next following, then the Vice-President shall act as President, as in the case of the death or other constitutional disability of the President. The person having the greatest number of votes as Vice-President, shall be the Vice-President, if such number be a majority of the whole number of electors appointed, and if no person have a majority, then from the two highest numbers on the list, the Senate shall choose the Vice-President; a quorum for the purpose shall consist of two-thirds of the whole number of Senators, and a majority of the whole number shall be necessary to a choice. But no person constitutionally ineligible to the office of President shall be eligible to that of Vice-President of the United States.

Case No.: 5:16-cv-07069-EJD
ORDER DENYING PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

the information and discernment requisite to such complicated investigations." He also felt the Electoral College would afford little opportunity to "tumult and disorder" and achieve opposition to "cabal, intrigue, and corruption," as those were the "most deadly adversaries of republican government."

Furthermore, Hamilton opined that the process of election through the Electoral College "affords to a moral certainty, that the office of President will never fall to the lot of any man who is not in an eminent degree endowed with the requisite qualifications." He continued:

> Talents for low intrigue, and the little arts of popularity, may alone suffice to elevate a man to the first honors in a single State; but it will require other talents, and a different kind of merit, to establish him in the esteem and confidence of the whole Union, or of so considerable a portion of it as would be necessary to make him a successful candidate for the distinguished office of President of the United States. It will not be too strong to say, that there will be a constant probability of seeing the station filled by characters pre-eminent for ability and virtue.

Hamilton's statements in Federalist No. 68 are informative on the meaning intended by the framers of the Constitution in Article II, § 1. Indeed, his statements reflect the notion that "[t]he electoral college was designed by men who did not want the election of the President to be left to the people." Gray v. Sanders, 372 U.S. 368, 377 n.8 (1963); accord Ray v. Blair, 343 U.S. 214, 225 n. 16 (1952) ("'Doubtless it was supposed that the electors would exercise a reasonable independence and fair judgment in the selection of the Chief Executive . . . .'" (quoting McPherson v. Blacker, 146 U.S. 1, 36 (1892)).[5] Elections Code §§ 6906 and 18002, which together compel California electors to vote for predefined candidates on pain of criminal punishment, cannot be neatly reconciled with the duties Hamilton attributed to the Electoral

---

[5] Justice Jackson commented further on this topic in a dissent filed in Ray, writing that "[n]o one faithful to our history can deny that the plan originally contemplated, what is implicit in its text, that the electors would be free agents, to exercise an independent and nonpartisan judgment as to the men best qualified for the Nation's highest offices." Ray, 343 U.S. at 232. Interestingly, and perhaps presciently, Justice Jackson also stated the "demise of the whole electoral system would not impress [him] as a disaster" because "[a]t its best it is a mystifying and distorting factor in presidential elections which may resolve a popular defeat into an electoral victory." Id. at 234.

College in Federalist No. 68, one of which was the privilege to analyze and deliberate on the choice of the office of the President.  And in turn, the statutes appear not only contrary to Article II, § 1, but render the implications of that section superfluous as to the votes of California electors.

At the same time, there is an equally viable counter-argument under which Elections Code §§ 6906 and 18002 pass constitutional scrutiny.  As the Attorney General and Secretary of State point out, Article II, § 1 explicitly designates the appointment of electors to the states.  The Supreme Court has described this appointment power as exclusive and plenary, "from the formation of the government until now."  McPherson, 146 U.S. at 35.  Thus, it is equally plausible to assert that California's regulation of its electors, which scheme would include Elections Code §§ 6906 and 18002 as well as those describing how electors are nominated and chosen, is a valid expression of the exclusive and plenary privilege provided to it by Article II, § 1.[6]

Moreover, the United States Supreme Court's opinion in Ray v. Blair provides some indication that the Court may not find the California statutes constitutionally troubling.  In Ray, the State Democratic Executive Committee of Alabama adopted a resolution requiring primary elector candidates to pledge their support to the nominees of the National Convention of the Democratic Party for President and Vice President.  343 U.S. at 222.  Blair refused to pledge and was excluded from candidacy, though he was otherwise qualified.  Id. at 215.  The Alabama Supreme Court upheld a peremptory writ of mandate requiring Ray, the chair of the Committee, to certify Blair as a candidate.  Id.

The Supreme Court reversed.  First, the Court held that presidential electors "act by authority of the state that in turn receives its authority from the Federal Constitution," and that

---

[6] Citing U.S. Term Limits, Inc. v. Thornton, 514 U.S. 779 (1995), Plaintiff argues Elections Code §§ 6906 and 18002 impermissibly add conditions to the role of elector in addition to requirements set forth in in the Constitution.  Notably, this argument is rendered unpersuasive and reliance on Thornton misplaced if the states are constitutionally vested with the exclusive authority to choose electors in the manner they prescribe and with the qualifications they desire.   In Thornton, the Supreme Court held the power to add congressional qualifications was not conferred to the states by the Constitition, and Arkansas' attempt to do so was therefore unconstitutional.  In contrast, the ability to choose electors has always been a power designated to the states.

8
Case No.: 5:16-cv-07069-EJD
ORDER DENYING PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

neither the language of Article II, § 1 nor the Twelfth Amendment forbid a political party from requiring a pledge. Id. at 224-25. Second, the Court held the pledge requirement was "an exercise of the state's right to appoint electors in such manner" under Article II, § 1. Id. at 228. Third, the Court addressed and rejected the argument that electors must have absolute freedom to vote their choice, reasoning:

> History teaches that the electors were expected to support the party nominees. Experts in the history of government recognize the longstanding practice. Indeed, more than twenty states do not print the names of the candidates for electors on the general election ballot. Instead, in one form or another, they allow a vote for the presidential candidate of the national conventions to be counted as a vote for his party's nominees for the electoral college. This long-continued practical interpretation of the constitutional propriety of an implied or oral pledge of his ballot by a candidate for elector as to his vote in the electoral college weighs heavily in considering the constitutionality of a pledge, such as the one here required, in the primary.

Id. at 228-29.

Though the constitutionality of general election pledges for electors was left undecided in Ray, it is possible if not likely the Court would apply the same realistic approach when examining state-imposed restrictions on presidential electors. The Ray Court's reasoning was based partly on the practical recognition that electors are actually chosen "simply to register the will of the appointing power in respect of a particular candidate." Id. at 230 n.16 (quoting McPherson, 146 U.S. at 36). If that sort of reduction in an elector's independence is determined constitutional, as it was for a primary elector in Ray, Plaintiff's argument based on Article II, § 1 collapses.

In any event, this discussion shows there are equally plausible opposing views concerning the constitutionality of Elections Code §§ 6906 and 18002. Though Plaintiff has not demonstrated he is likely to succeed on the merits of his arguments[7] any more than Defendants have

---

[7] Though the court is persuaded that Plaintiff's argument under Article II, § 1 constitutes a "serious question" for the purposes of this application, it is not persuaded by his other arguments. The contention that Elections Code §§ 6906 and 18002 violate the Equal Protection Clause of the Fourteenth Amendment appears foreclosed by Ray. See Ray, 343 U.S. at 226 n. 14. For his argument based on the federal criminal statute, 18 U.S.C. § 594, he has not provided authority

9
Case No.: 5:16-cv-07069-EJD
ORDER DENYING PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

demonstrated they are likely to succeed on their own, he has certainly raised a question "serious enough to require litigation." Benda, 584 F.2d at 315. Accordingly, the court finds Plaintiff has satisfied this element in a manner sufficient to proceed further.

### B. Plaintiff's Articulation of Irreparable Harm is Insufficient

An adequate showing of irreparable harm is the "single most important prerequisite for the issuance of a [TRO]." Freedom Holdings, Inc. v. Spitzer, 408 F.3d 112, 114 (2d Cir. 2005). To successfully make that showing, the moving plaintiff must "demonstrate that irreparable injury is *likely* in the absence of an injunction." Winter, 555 U.S. at 22 (emphasis preserved). A TRO ordered on anything less is "inconsistent" with the "characterization of injunctive relief as an extraordinary remedy . . . ." Id.

In assessing Plaintiff's motion, the court is mindful that the presentation of irreparable harm must be "clear." Garcia v. Google, 786 F.3d 733, 746 (9th Cir. 2015). "Speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction." Caribbean Marine Servs. Co. v. Baldrige, 844 F.2d 668, 674 (9th Cir. 1988). To that end, "[a] plaintiff must do more than merely allege imminent harm sufficient to establish standing; a plaintiff must demonstrate immediate threatened injury as a prerequisite to preliminary injunctive relief." Id. "Subjective apprehensions and unsupported predictions . . . are not sufficient to satisfy a plaintiff's burden of demonstrating an immediate threat of irreparable harm." Id. at 675-76.

Plaintiff argues that if forced to vote for President and Vice President under the coercion of Elections Code §§ 6906 and 18002, he will "suffer irreparable injury in not being able to perform the job for which he has been chosen by the citizens of California without subjecting himself to possible criminal prosecution if he does not vote as California law currently coerces him to do." He states that if convicted, he could be subjected to a "fine of $1000, and/or imprisonment for 16 months, or two to three years." Dkt. No. 30, at ¶ 8. Plaintiff also states that a felony conviction

---

explaining why it applies to the votes of electors, and if it does, why it supersedes the plenary grant to the states in Article II, § 1. Similarly, Plaintiff's First Amendment argument is legally unsupported and unpersuasive for that reason.

would disqualify him from voting, prohibit him from sitting on a jury, ban him from conducting business with the government, preclude him from possessing a firearm, prevent him from holding federal office, and "result in many other negative consequences personally, financially, socially, and professionally," including mental anguish or distress. Id. at ¶ 9.

Plaintiff's own framing of this element demonstrates why it is unsatisfied. As to the likelihood that any of the identified harms will actually occur, Plaintiff relies on the mere potential for a criminal prosecution under Elections Code § 18002. He has not provided anything to demonstrate that a prosecution is *likely* should he vote for individuals other than Clinton and Kaine. To emphasize that shortcoming, the Attorney General and Secretary of State highlight the absence of evidence in Plaintiff's application showing that any California elector has ever been prosecuted or threatened with prosecution under § 18002.[8] This articulation of harm based only on possibility or risk does not constitute a "clear showing" that a non-speculative, imminent injury is likely to occur in the absence of a TRO. See Winter, 555 U.S. at 22 (rejecting a "possibility" standard in the context of injunctive relief as "too lenient").

Furthermore, Plaintiff's statements leave it entirely speculative whether the possibility of a § 18002 prosecution will arise at all because he has not revealed commitment to a particular vote. In his Verified Complaint, Plaintiff indicates a "stated intention to not necessarily place his vote for Hillary Clinton and Tim Kaine . . . ." Dkt. No. 1, at ¶ 24. And the statements made in his supplemental declaration are equally equivocal; though Plaintiff is compelled "to decide that Mitt Romney, John Kasich, or another qualified compromise candidate, would be the correct choice" for his vote, he apparently has not yet settled on one those individuals over Clinton, and in fact states he will vote for Clinton "as the California law stands now." Dkt. No. 30, at ¶¶ 3, 10.

Moreover, the court is not persuaded that Plaintiff has identified a harm that is actually irreparable, even assuming a criminal prosecution is likely. This is so because Plaintiff would still

---

[8] Plaintiff did, however, provide supplemental information concerning a potential for the prosecution of electors in Colorado. Dkt. No. 33.

11
Case No.: 5:16-cv-07069-EJD
ORDER DENYING PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

1  have mechanisms to divert or defend against a prosecution if one were initiated, and to challenge a

2  conviction if one was obtained.  Because the criminal penalty referenced in § 18002 stems from

3  California Penal Code § 1170(h), a judge handling the matter could defer entry of judgment or

4  engage pretrial diversion, both of which would result in no conviction.  If the prosecution

5  progressed to trial, Plaintiff could mount a defense and could ultimately prevail.  If he was

6  convicted, a judge could reduce the felony conviction to a misdemeanor under California Penal

7  Code § 17, he could request expungement and record clearance under California Penal Code §

8  1203.4, or he could pursue habeas relief.

In sum, the court finds that Plaintiff's description of potential ensuing harm is not the type of "immediate threatened injury" required for a TRO.  As such, the court need not address the other factors necessary for injunctive relief because Plaintiff is not entitled to the extraordinary remedy he seeks.  See Leiva-Perez v. Holder, 640 F.3d 962, 965 (9th Cir. 2011) (holding that injunctive relief may not issue absent a "threshold showing regarding irreparable harm . . . regardless of the petitioner's proof regarding the other [] factors"); see also Blackburn v. State Dep't of Soc. & Health Servs., 472 Fed. Appx. 569, 570-71 (9th Cir. 2012).

## IV.  ORDER

Based on the foregoing, the Motion for Temporary Restraining Order and Preliminary Injunction (Dkt. No. 4) is DENIED.

**IT IS SO ORDERED.**

Dated:  December 16, 2016



EDWARD J. DAVILA
United States District Judge

Case No.: 5:16-cv-07069-EJD
ORDER DENYING PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION