1   Charles H. Bell, Jr. (SBN 060553)
    *cbell@bmhlaw.com*
2   Brian T. Hildreth (SBN 214131)
    *bhildreth@bmhlaw.com*
3   Terry J. Martin (SBN 307802)
    *tmartin@bmhlaw.com*
4   **BELL, McANDREWS & HILTACHK, LLP**
    455 Capitol Mall, Suite 600
5   Sacramento, California 95814
    Telephone:    (916) 442-7757
6   Facsimile:    (916) 442-7759

7   Attorneys for Intervenor
    CALIFORNIA REPUBLICAN PARTY
8

9              UNITED STATES DISTRICT COURT

10            NORTHERN DISTRICT OF CALIFORNIA

11                  SAN JOSE DIVISION

12  VINZENZ J. KOLLER, an individual and       Case No.  5:16-cv-07069
    Presidential Elector,
13                                              **INTERVENOR CALIFORNIA**
                                                **REPUBLICAN PARTY'S MOTION TO**
14              Plaintiff,                      **DISMISS PLAINTIFF'S FIRST AMENDED**
                                                **COMPLAINT**
15          vs.

16  JERRY BROWN, in his official capacity as    **Date:** August 17, 2017
    Governor for the State of California;       **Time:** 9:00 am
17  KAMALA HARRIS, in her official capacity as  **Dept:** 4
    Attorney General for the State of California; **Judge:** The Honorable Edward J. Davila
18  ALEX PADILLA, in his official capacity as   **Action Filed:** December 9, 2016
    Secretary of State for the state of California;
19  and DOES 1-10,

20
                Defendants.
21

22

23

24

25

26

27

28

---

<u>**TABLE OF CONTENTS**</u>                          <u>**Page No:**</u>

INTRODUCTION ...................................................................................................................1

CASE HISTORY ....................................................................................................................3

STANDARD OF REVIEW .....................................................................................................4

ARGUMENT ...........................................................................................................................4

    I.     The Court Lacks Article III Jurisdiction Over This Case ........................................4

          A.    Koller Lacks Standing...................................................................................5

          B.    This Lawsuit Is Moot ...................................................................................8

          C.    This Lawsuit Presents A Non-Justiciable Political Question....................10

    II.    Koller Fails To State A Claim For Relief .............................................................10

          A.    Courts Have Already Rejected Koller's Claims As Meritless ..................11

          B.    The Article II and Twelfth Amendment Claims Are Meritless ................11

                  1.    Precedent Establishes That States May Bind Electors..................12

                  2.    Original Understanding Confirms That States May Bind Electors..................................................................................................16

                  3.    Longstanding Practice Confirms That States May Bind Electors..................................................................................................17

          C.    The First Amendment Claim Is Meritless.................................................18

          D.    Koller's Statutory Claim Is Unlikely To Succeed.....................................21

i

## TABLE OF AUTHORITIES                    <u>Page Numbers:</u>

**<u>ARTICLES</u>**

3 *Commentaries* § 1457 ............................................................................................18, 21

Article II.  3 Joseph Story, *Commentaries on the Constitution of the United States*
  § 1460 (1833). ...................................................................................................16

Beverly J. Ross & William Josephson, *The Electoral College and the Popular
  Vote*, 12 J.L. & Politics 665, 696 (1996)............................................................13, 14

Edward Stanwood, *A History of the Presidency from 1788 to 1897*, at 51 (1898)......................16

**<u>CASES</u>**

*Abdurrahman v. Dayton*,
  2016 WL 7428193 (D. Minn. 2016) ............................................................3, 8, 9, 11, 13, 21

*Already, LLC v. Nike, Inc.*,
  133 S. Ct. 721, 726 (2013) .................................................................................8

*Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*,
  135 S. Ct. 2652, 2673 (2015) ............................................................................14

*Baca v. Hickenlooper*,
  No. 16-1482, Dkt. No. 15 (10th Cir. Dec. 16, 2016) (Ex. A) .....................2, 11, 13, 19, 20, 23

*Beers v. Arkansas*, 20 How.
  527, 529 (1857) ..........................................................................................14

*Brady Campaign v. Brownback*,
  110 F. Supp. 3d 1086, 1097–98 (D. Kan. 2015) .......................................................7

*Burdick v. Takushi*,
  504 U.S. 428, 434 (1992); .............................................................................20

*Burroughs v. United States*
  290 U.S. 534, 545 (1934) ...............................................................................14

*Bush*,
  531 U.S. at 104..........................................................................................13, 21

*Carrigan*,
  564 U.S. at 125–27 ......................................................................................19

*Cf. South Dakota v. Dole*,
  483 U.S. 203, 206 (1987) ..............................................................................13

*Chenault v. Carter*,
  332 S.W.2d 623, 626 (Ky. 1960) .........................................................................6

*Chiafalo v. Inslee*,
  No. 16-36034, Dkt. No. 16 (9th Cir. Dec. 16, 2016) (Ex. B) ...........................2, 11, 13, 19, 20

i

*Chula Vista Citizens for Jobs & Fair Competition v. Norris*,
    782 F.3d 520, 531 (9th Cir. 2015)........................................................................21

*Cohen v. Cowles Media Co.*,
    501 U.S. 663, 672 (1991)...................................................................................20

*Crowell v. Benson*,
    285 U.S. 22, 62 (1932).......................................................................................22

*Daniels-Hall v. Nat'l Educ. Ass'n*,
    629 F.3d 992, 998 (9th Cir. 2010)........................................................................4

*Davis v. FEC*,
    554 U.S. 724, 734 (2008).................................................................................5, 8

*Doe v. Madison Sch. Dist. No. 321*,
    177 F.3d 789, 798 (9th Cir. 1999) (*en banc*) ........................................................8

*Eu v. San Francisco County Democratic Central Comm.*,
    489 U.S. 214, 231 (1989)...................................................................................20

*Fed. Election Comm'n v. Wisconsin Right to Life, Inc.*,
    551 U.S. 449, 462 (2007).....................................................................................8

*Feldman v. Bomar*,
    518 F.3d 637, 644 (9th Cir. 2008)........................................................................8

*Garcetti v. Ceballos*,
    547 U.S. 410, 421–22 (2006)..............................................................................19

*Gelineau v. Johnson*, 904 F. Supp. 2d
    742, 745 (W.D. Mich. 2012)..............................................................................13

*Golan v. Holder*,
    132 S. Ct. 873, 891 (2012).................................................................................18

*Graham v. Connor*,
    490 U.S. 386, 395 (1989)...................................................................................18

*Green*,
    134 U.S. 377, 379 (1890)...................................................................................14

*Gregory v. Ashcroft*,
    501 U.S. 452, 460 (1991).............................................................................14, 22

*Hall v. Beals*,
    396 U.S. 45, 52 (1969).......................................................................................21

*Honig v. Doe*,
    484 U.S. 305, 317 (1988)......................................................................................4

*Jones v. Schneiderman*,
    101 F. Supp. 3d 283, 295 (S.D.N.Y. 2015)..........................................................7

*Koller v. Brown*,
    2016 WL 7325032 (N.D. Cal. Dec. 16, 2016). ....................................................3

TABLE OF AUTHORITIES

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555, 559 (1992)); (2) ................................................................4, 5, 7

*McPherson v. Blacker*,
    146 U.S 1, 25 (1892). .......................................................................13, 22

*Nev. Ethics Comm'n v. Carrigan*,
    564 U.S. 117, 127 (2011) ..........................................................................19

*Nixon v. United States*,
    506 U.S. 224, 228 (1993) .......................................................................5, 10

*NLRB v. Noel Canning*,
    134 S. Ct. 2550, 2559 (2014) ....................................................................17

*Raines v. Byrd*,
    521 U.S. 811, 826 (1997) ...........................................................................5

*Ray v. Blair*,
    343 U.S. 214, 224–25 (1952). ............................................6, 12, 13, 14, 16, 17

*Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*,
    547 U.S. 47, 66 (2006) .............................................................................19

*San Diego Gun Rights Committee v. Reno*,
    98 F.3d 1121, 1127 (9th Cir. 1996) ..............................................................7

*SBA List v. Driehaus*,
    134 S. Ct. 2334, 2342 (2014). .....................................................................7

*Schick v. Reed*,
    419 U.S. 256, 261 (1974) ..........................................................................14

*Simon v. E. Ky. Welfare Rights Org.*,
    426 U.S. 26, 37 (1976). ..............................................................................4

*Smith v. Indiana*,
    191 U.S. 138 (1903) ..................................................................................5

*Spreckels v. Graham*,
    228 P. 1040, 1045 (Cal. 1924) ..............................................................15, 19

*State v. Wait*,
    138 N.W. 159 (Neb. 1912) ........................................................................15

*Thomas v. Cohen*,
    262 N.Y.S. 320, 326 (1933) .............................................................15, 19, 23

*Thomas v. Mundell*,
    572 F.3d 756 (9th Cir. 2009) ......................................................................6

*Valley Forge Christian College v. Americans United for Separation of Church & State*, 454 U.S. 464, 471 (1997) .......................................................4

*Walker v. United States*,
    93 F.2d 383, 388 (8th Cir. 1937) .................................................................6

iii

*Will v. Mich. Dept. of State Police*,
 491 U.S. 58, 71 (1989)..................................................................................22

*Witt v. Dept. of Air Force*,
 527 F.3d 806, 818 (9th Cir. 2008).................................................................12

*Wolfe v. Strankman*,
 392 F.3d 358, 362 (9th Cir. 2004)...................................................................4

*Yates v. United States*,
 135 S. Ct. 1074, 1085 (2015) ........................................................................22

**CODES**

18 U.S.C. § 594 .........................................................................................4, 21

California Election Code:

 § 6901 .......................................................................................................2, 6

 § 6902 ..........................................................................................................2

 § 6906 ...................................................................................................2, 3, 4

 § 18002 ......................................................................................................3, 4

 § 18540 .........................................................................................................4

75 Stat. 819 ................................................................................................22

**CONSTITUTIONAL PROVISIONS**

521 U.S. at 814–15 ........................................................................................5

§ 594 ..........................................................................................................22

26 U.S.C. § 9011 ..........................................................................................21

3 U.S.C. § 15 ...............................................................................................10

506 U.S. at 226 ............................................................................................10

First Amendment................................................................10, 18, 19, 20

Twelfth Amendment ..................................................................10, 16, 17, 18

Twenty-third Amendment..............................................................................17

U.S. Const. art. II, ..................................................................................2, 3, 13

U.S. Const. art. III, § 2, cl. 1 ..........................................................................4

**CONGRESSIONAL RECORD**

343 U.S. at 228 n.15 (quoting S. Rep. No. 22, 19th Cong., 1st Sess., at 4 (1826)). ....................16

115 Cong. Rec. 9–11, 145–71, 197–246 (1969) ............................................................10

Cong. Rec., 115th Cong., H186 (Jan. 6, 2017). ..............................................................7

Cong. Rec., 115th Cong., H186 (Jan. 6, 2017) ...............................................................3

**OTHER AUTHORITIES**

11 Annals of Congress 1289–90 (1802) ...............................................................16, 17

S. Doc. No. 111-15, at 346–434 (2010) ...................................................................17

**RULES**

Civil Rule 12(b)(1)...........................................................................................1, 4, 5

Civil Rule 12(b)(6)..............................................................................................1, 4

**INTRODUCTION**

In his Amended Complaint, Plaintiff Vinzenz Koller persists in maintaining a challenge to state faithless-elector laws long after many courts (including the Ninth Circuit) rejected the challenges as meritless.  This Court should dismiss the Amended Complaint.

To start, the Court should dismiss the complaint under Rule 12(b)(1) because the Court lacks Article III jurisdiction over the lawsuit.  First, Koller lacks standing to bring this lawsuit.  The faithless-elector law caused him no injury because it restricts his official powers rather than his personal rights.  It also caused him no injury because he never articulated concrete plans to violate it.  Second, even if Koller once had standing to bring this lawsuit, the lawsuit is now moot.  Koller already cast his electoral vote and the 2016 presidential election is over; there is no longer a live dispute for the Court to adjudicate.  Finally, Koller's challenge raises a political question.  The Constitution commits the resolution of disputes concerning electoral votes to Congress, not to the courts.

At a minimum, the Court should dismiss Koller's complaint under Rule 12(b)(6), because the complaint fails to state a claim on which relief can be granted.  In the aftermath of the 2016 election, the Ninth Circuit, Tenth Circuit, Western District of Washington, and District of Colorado all rejected challenges to state faithless-elector laws.  The Ninth Circuit, indeed, ruled that the challengers could not show even a "serious question" about the validity of such laws.  Rightly so.  Koller's Article II and Twelfth Amendment claims contradict the Constitution's express terms (which grant state legislatures broad authority to regulate electors), two centuries of practice (which confirm that state legislatures may use that authority to require how electors vote), and controlling Supreme Court precedent (which establishes that electors have no constitutional right to defy the will of the voters).  Koller's First Amendment claim overlooks the reality that he has no free-speech rights in casting an electoral vote, as well as the reality that the state's interests in promoting democracy amply justify the faithless-elector restrictions.  And Koller's last-ditch efforts to jury-rig a claim based on voter intimidation is likewise meritless.

In sum, because this Court has no jurisdiction and the Amended Complaint does not state a claim upon which relief can be granted, this Court should dismiss the Amended Complaint.

## BACKGROUND

The Constitution vests with each state legislature the power to prescribe the manner of selecting electors for the quadrennial election of the President and Vice President of the United States.  U.S. Const. Art. II, § 1.  The California State Legislature (like every other state) has given that power to the People.  Each political party in California submits nominees for electors to the state.  Cal. Elections Code § 6901.  The state then "place[s]" "the names of the candidates *for President and Vice President*" "upon the ballot."  *Id.* (emphasis added).  Using that ballot, the "voters of the state" elect the electors.  *Id.* § 6902.  The electors then meet in December, when they must vote for "the candidates of the political party which they represent."  *Id.* § 6906.

In 2016, the Democratic Party nominated Plaintiff Vinzenz Koller for elector in California.  Am. Compl. ¶ 1.  On November 8, the People of California cast a majority of their votes for the Democratic Party's presidential and vice-presidential candidates, Hillary Clinton and Tim Kaine.  Koller accordingly won election as one of California's electors, and was thus required to cast his votes for Clinton and Kaine.  Cal. Elections Code § 6906.

Meanwhile, the Republican Party's candidates, Donald Trump and Mike Pence, won a majority of the nation's electoral votes.  As part of an effort to thwart the election of Mr. Trump and Governor Pence, however, some Democratic electors in Colorado, Washington, Minnesota, and California (all states carried by Secretary Clinton) launched lawsuits challenging those states' laws binding electors to vote according to the People's will.  Every challenge failed.  In Colorado and Washington, the district courts denied preliminary injunctions and the court of appeals denied injunctions pending appeal.  *See Baca v. Hickenlooper*, No. 16-1482, Dkt. No. 15 (10th Cir. Dec. 16, 2016) (Ex. A); *Chiafalo v. Inslee*, No. 16-36034, Dkt. No. 16 (9th Cir. Dec. 16, 2016) (Ex. B).  In Minnesota, the district court also denied a preliminary injunction.  *Abdurrahman v. Dayton*,

2016 WL 7428193 (D. Minn. 2016).  And in this case, the court denied a preliminary injunction. *Koller v. Brown*, 2016 WL 7325032 (N.D. Cal. Dec. 16, 2016).

On December 19, 2016, the Electoral College met and elected Mr. Trump as President and Governor Pence as Vice President.  California's electors (including Koller) all voted for Secretary Clinton and Senator Kaine.  *See* Cong. Rec., 115th Cong., H186 (Jan. 6, 2017).

## CASE HISTORY

Plaintiff Vinzenz Koller is a registered Democratic Party voter who was a Presidential elector pledged to support Hillary Clinton for President and Tim Kaine for Vice President in 2016.  On December 9, 2016, Koller filed his original Complaint (Dkt. 1) against Governor Jerry Brown, Secretary of State Alex Padilla and then-Attorney General Kamala Harris.  Dkt. 1.  At the same time, he sought a temporary restraining order and preliminary injunction, to prevent the enforcement of California Elections Code sections 6906 and 18002.  Dkt. 4.  Section 6906 requires Presidential electors to vote for the candidate of the political party of the Presidential elector.   He contends section 18002 provides for enforcement of section 6906.  Koller argued that these provisions violated his rights under Article II of the Constitution as well as the Twelfth and First Amendments to the Constitution.  Complaint ¶ 59.

Within days, the California Republican Party moved to intervene (Dkt. 14), and subsequently participated in the hearing on the temporary restraining order and preliminary injunction (Dkts. 31, 34).  After the hearing, the Court denied the Plaintiff's TRO and preliminary injunction motion. Dkts. 34, 37.  Koller filed a notice of appeal to the Ninth Circuit on December 16, 2016 (Dkt. 35), but withdrew the appeal after the Electoral College met (Dkt. 50).

On January 3, 2017, this Court granted the Republican Party's motion to intervene.  Dkt. 57.  Koller then filed an amended Complaint against Attorney General Xavier Becerra, Secretary of State Alex Padilla and Kamala Harris, in her individual capacity. Dkt. 83.  The Amended Complaint alleges that Koller was a 2016 Presidential elector, that he was coerced and intimidated by Defendants Harris and Padilla into voting for the Democratic Party's Presidential

and Vice Presidential candidates in violation of 18 U.S.C. § 594 and Calif. Elec. Code § 18540, and that Defendants Harris, Padilla and Becerra failed to disclaim possible prosecution of Plaintiff under Elections Code §§ 6906 and 18002. Amended Complaint ¶¶ 1, 51-54.  He seeks "retroactive relief relating to the completed unconstitutional actions against him, and prospective relief to act as a Presidential Elector."  Complaint, Intro, p.2.

## STANDARD OF REVIEW

Civil Rule 12(b)(1) allows a court to dismiss a case for "lack of subject-matter jurisdiction."  When ruling on a motion under Rule 12(b)(1), the Court should consider whether the complaint survives both a "facial" attack and a "factual" attack.  *Wolfe v. Strankman*, 392 F.3d 358, 362 (9th Cir. 2004).  In resolving a facial attack, like the one brought here, a court should assume "[the complaint's] allegations to be true" and determine whether the allegations "are insufficient on their face to establish subject matter jurisdiction."  *Id.*  Civil Rule 12(b)(6) allows a court to dismiss a case for "failure to state a claim for which relief can be granted."  When ruling on a motion under Rule 12(b)(6), the Court should "accept as true all well-pleaded allegations of material fact."  *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010).

## ARGUMENT

## I.   THE COURT LACKS ARTICLE III JURISDICTION OVER THIS CASE

Article III of the Constitution provides that federal courts may adjudicate only "Cases" and "Controversies."  U.S. Const. art. III, § 2, cl. 1.  This rule is a "bedrock requirement."  *Valley Forge Christian College v. Americans United for Separation of Church & State*, 454 U.S. 464, 471 (1997).  "No principle is more fundamental to the judiciary's proper role in our system of government."  *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 37 (1976).

A lawsuit amounts to a case or controversy only if (among other requirements) (1) the plaintiff has Article III standing (*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559 (1992)); (2) the lawsuit is live rather than moot (*Honig v. Doe*, 484 U.S. 305, 317 (1988)); and (3) the lawsuit

4

does not present a political question (*Nixon v. United States*, 506 U.S. 224, 228 (1993).  This lawsuit runs afoul of each of these three requirements, and thus warrants dismissal under Rule 12(b)(1).

### A.  Koller Lacks Standing

A plaintiff has Article III standing only if he has suffered an "injury in fact," the injury is "fairly traceable to the challenged action of the defendant," and it is "likely … that the injury will be redressed by a favorable decision."  *Lujan*, 504 U.S. at 560 (quotation marks and alterations omitted).  "[T]he standing inquiry [is] focused on whether the party invoking jurisdiction had the requisite stake in the outcome *when the suit was filed*."  *Davis v. FEC*, 554 U.S. 724, 734 (2008) (emphasis added).

Here, Koller lacked standing at the time he filed this lawsuit.  Koller had not suffered an injury in fact, because the challenged law restricts his official powers rather than his personal rights, and also because Koller never had any concrete plans to violate the law.

*First*, a plaintiff suffering an "injury to official authority to power" does not have standing.  *Raines v. Byrd*, 521 U.S. 811, 826 (1997).  Rather, to have standing, a plaintiff must suffer a "*personal injury.*"  *Id.* at 818 (emphasis in original).  "The injury must affect the plaintiff in a personal and individual way."  *Id.* at 819.

The Supreme Court and Ninth Circuit have repeatedly ruled that injuries to official rather than personal interests do not confer standing.  For example, in *Smith v. Indiana*, 191 U.S. 138 (1903), the Supreme Court held that a county auditor lacked standing to challenge a law regulating his official duties.  The Court explained: "[T]he auditor had no personal interest in the litigation.  He had certain duties as a public officer to perform.   The performance of those duties was of no personal benefit to him.  Their nonperformance was equally so. … [T]he interest of [a litigant in federal court] should be a personal, and not an official, interest."  *Id.* at 149.

Similarly, in *Raines v. Byrd*, the Supreme Court held that members of Congress lacked standing to challenge the Line Item Veto Act, even though that statute allegedly infringed the members' legislative powers.  521 U.S. at 814–15.  The Court emphasized that a plaintiff must

establish a personal stake in the litigation in order to show standing.  It explained that claim of standing on the basis of "injury to official authority or power" both "lack[s] support from precedent" and contradicts "historical practice."  *Id.* at 826.  Applying these principles to the case at hand, the Court continued that members of Congress lack power to challenge a statute affecting their powers, since the claimed injury consisted of "a loss of political power, not loss of any private right."  *Id.* at 821.  Put another way, the claimed injury did not suffice because it "r[an] … with the Member's seat, … which the Member holds … as trustee for his constituents, not as a prerogative of personal power."  *Id.*

So too, in *Thomas v. Mundell*, 572 F.3d 756 (9th Cir. 2009), the Ninth Circuit ruled that a county prosecutor lacked standing to challenge a law affecting his prosecutorial powers.  The court of appeals began by emphasizing "[t]he distinction … between 'official' and 'personal' interests."  *Id.* at 760.  It ruled that the county prosecutor lacked standing "because his interest in [the] case [was] official, and not personal."  *Id.* at 761.  As the court elaborated: "[The prosecutor's] claimed injury … is based on the loss of his institutional power as County Attorney, not the loss of any private right.  … [T]he alleged [harms] … run with the office, and cannot be considered injuries personal to [the plaintiff]."  *Id.* at 762.

These principles doom Koller's lawsuit.  Koller's claimed injury consists of being "requir[ed] … to vote [in the Electoral College] consistent with the popular vote in [his] state."  Am. Compl. ¶ 69.  But "presidential electors are officers of the state."  *Walker v. United States*, 93 F.2d 383, 388 (8th Cir. 1937); *see Chenault v. Carter*, 332 S.W.2d 623, 626 (Ky. 1960) ("presidential electors … are state officers").  They "act by authority of the state," which "in turn receives its authority from the federal constitution."  *Ray v. Blair*, 343 U.S. 214, 224–25 (1952).  California Elections Code § 6901, California's faithless-elector law, therefore, regulates Koller only in his official capacity.  It restricts his exercise of his official power (held as a trustee of California's People) to cast an electoral vote, but it does not restrict his exercise of any personal or private rights.  Its restrictions run with Koller's office; they do not affect Koller in any personal

and individual way.  Just as in *Smith*, *Raines*, and *Mundell*, therefore, the restrictions do not establish the personal injury needed to sue in federal court.

   *Second*, a plaintiff has standing to bring a pre-enforcement challenge to a statute only if the plaintiff has established "an intention to engage in a course of conduct … proscribed by [the] statute."  *SBA List v. Driehaus*, 134 S. Ct. 2334, 2342 (2014).  In particular, the plaintiff must have "concrete plans" to engage in the proscribed conduct.  *Lujan*, 504 U.S. at 564.  This principle reflects the commonsense notion that a statute cannot concretely and imminently injure someone who does not plan to violate it.

   Courts routinely enforce these principles.  For example, in *San Diego Gun Rights Committee v. Reno*, 98 F.3d 1121, 1127 (9th Cir. 1996), a plaintiff's allegation that it "wish[ed] and intend[ed] to engage in [prohibited] activities" did not suffice, since the plaintiffs had failed to "articulate[e] concrete plans."  Similarly, in *Brady Campaign v. Brownback*, 110 F. Supp. 3d 1086, 1097–98 (D. Kan. 2015), the court denied standing because the plaintiff lacked "concrete plans to engage in conduct proscribed by the Act."  The plaintiff asserted only the "possibility" of engaging in the conduct, a "conjectural" suggestion that "f[ell] well short" of satisfying Article III.  *Id.* at 1098.  So too in *Jones v. Schneiderman*, 101 F. Supp. 3d 283, 295 (S.D.N.Y. 2015), where a plaintiff who "potentially" sought to violate a statute also lacked standing, as that "indeterminate commitment" "d[id] not rise to the level of a concrete plan."

   Here, Koller did not establish even a bare intention (never mind a concrete plan) that he ever planned to violate California's presidential-elector statute by casting his vote for anyone other than Hillary Clinton and Tim Kaine.  In pleadings filed before the meeting of the Electoral College, Koller alleged that he would "*not necessarily*" vote for Clinton and Kaine.  Compl. ¶ 25 (emphasis added).  Similarly, he asserted that he "may vote for" Clinton and Kaine after all.  Mot. for Prelim. Inj. 7, Dkt. 4.  Then, when the Electoral College met on December 19, 2016, Koller *did* vote for Hillary Clinton and Tim Kaine, in accordance with his pledge.  Cong. Rec., 115th Cong., H186 (Jan. 6, 2017).  Now, in his Amended Complaint, Koller represents that before the Electoral College met he had nothing more than an "intention to *not necessarily* place his vote for

7

1
2
3
4

Hillary Clinton and Tim Kaine." Am. Compl. ¶ 57 (emphasis added).  These allegations establish that, when Koller filed this lawsuit, there was *at most* an "indeterminate" and "conjectural" "possibility" that he might violate the challenged statute.  Koller certainly did not have concrete plans to violate the statute.  He therefore lacks standing.

5

**B.  This Lawsuit Is Moot**

6
7
8
9
10
11
12
13
14
15

Regardless of whether a plaintiff had standing at the outset of the case, "[a] case becomes moot … when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Already, LLC v. Nike, Inc.*, 133 S. Ct. 721, 726 (2013).  This case became moot on December 19, 2016, when California's electors (including Koller) all cast their electoral votes for Hillary Clinton and Tim Kaine.  Since Koller has already cast his electoral vote, there is no longer a live controversy about whether California may restrict his casting of that vote.  And since Koller has already cast his electoral vote for Clinton and Kaine, Koller no longer has a legally cognizable interest in whether California could have prosecuted him "*if* he had voted for anyone … other than Clinton and Kaine" (Am. Compl. ¶ 72).

16
17
18
19
20
21
22

To be sure, a case is not moot if it is "capable of repetition, yet evading review." *Davis*, 554 U.S. at 735.  But in order to invoke that exception — which applies only in "extraordinary cases" (*Doe v. Madison Sch. Dist. No. 321*, 177 F.3d 789, 798 (9th Cir. 1999) (*en banc*)) — a plaintiff must establish (among other requirements) that "there is a reasonable expectation that the same complaining party will be subjected to the same action again." *Fed. Election Comm'n v. Wisconsin Right to Life, Inc.*, 551 U.S. 449, 462 (2007); *see Feldman v. Bomar*, 518 F.3d 637, 644 (9th Cir. 2008).  Koller cannot make that showing.

23
24
25
26
27
28

*Abdurrahman v. Dayton*, another case arising from this election cycle and involving a state's faithless-elector law, shows why the capable-of-repetition exception does not apply here.  In *Abdurrahman*, a Democratic elector in Minnesota attempted to vote faithlessly on December 19, but was removed and replaced by an alternate as a result.  2016 WL 7428193, at *1.  The elector sued state officials, but the court ruled that his lawsuit was moot, and could not be saved by the capable-of-repetition exception.  *Id.* at *1–*2.  The court explained that to fit within the

8

exception, the elector would have to show that he would "again (1) be nominated as an elector by the [Democratic Party]; (2) during an election when the Democratic Party's nominee wins the Minnesota popular vote; and (3) ignore his pledge and vote for someone other than the Democratic Party's nominee." *Id.* at *2.  The court deemed it "especially unlikely" that the elector "could complete the first prerequisite," "now that he ha[d] identified himself as an elector who will ignore his pledge." *Id.*  In addition, although it remained "theoretically possible" that the elector "could complete all three prerequisites," a "theoretical possibility is insufficient to overcome the jurisdictional hurdle of mootness." *Id.*

That reasoning applies here.  In order to establish a "reasonable expectation" that Koller will face punishment under California's faithless-elector law in the future, Koller must show a "reasonable expectation" that (1) the Democratic Party will nominate him as an elector in 2020, (2) the Democratic Party's nominees for President and Vice President will win California's popular vote, and (3) Koller will ignore his pledge and vote for someone other than his party's nominees.  Koller cannot show a reasonable expectation that any one of these events will occur, much less that all three of them will.  First, Koller makes no effort to show that the Democratic Party will nominate him for elector in 2020 (beyond asserting that he remains "eligible" to serve). Am. Compl. ¶ 58.  Just as in *Abdurrahman*, it is "especially unlikely" that the party will do so now that Koller has admitted he is willing to violate his pledge.  Second, Koller makes no effort to show that his party will win in California in 2020.  Republican candidates have carried California before, and they could certainly do so again.  Finally, Koller makes no effort to show that he will vote faithlessly in 2020.  Indeed, since Koller failed to form concrete plans to violate his pledge in *this* election, he can hardly have made concrete plans to violate it four years from now.

In short, Koller cannot establish that he will be subject to the same purported injury again in 2020.  His challenge does not fit within the capable-of-repetition exception, and is accordingly moot.

1

2

### C.  This Lawsuit Presents A Non-Justiciable Political Question

3

A case presents a political question if there is "a textually demonstrable constitutional

4

commitment of the issue to a coordinate political department."  *Nixon*, 506 U.S. at 228.  Koller's

5

case presents a political question because the Constitution commits the resolution of disputes

6

concerning electors' votes to Congress.

7

The Twelfth Amendment provides that electoral votes "shall … be counted" before "the

8

Senate and House of Representatives."  This text commits to *Congress* the responsibility to count

9

electoral votes—and, thus, to resolve disputes about which votes to count.  Congress has

10

accordingly enacted a statute addressing the resolution of electoral-vote disputes.  3 U.S.C. § 15.

11

And it has acted under that statute to resolve disputes relating to faithless electors.  *See* 115 Cong.

12

Rec. 9–11, 145–71, 197–246 (1969) (deciding whether to count vote cast by faithless elector from

13

North Carolina, which did not bind its electors at the time).  It is thus up to Congress, not courts,

14

to decide whether to count any votes that Koller might cast in violation of California's laws

15

governing presidential electors.

16

The Supreme Court's holding in *Nixon* confirms these conclusions.  *Nixon* held that

17

disputes concerning impeachments present political questions.  506 U.S. at 226.  The Court

18

reasoned that judicial review of impeachments, especially presidential impeachments, would

19

"expose the political life of the country to months, or perhaps years, of chaos," severely impairing

20

the "legitimacy" and "effectiveness" "of any successor" "while the judicial process was running

21

its course."  *Id.* at 236.  That rationale applies not only to the removal of a President, but also to

22

the selection of one.  If courts seek to decide (potentially in conflicting opinions) which electoral

23

votes count and which do not, they would undoubtedly throw the country's political life into

24

chaos and impair the legitimacy and effectiveness of any new President.  These realities counsel

25

in favor of invoking the political-question doctrine here.

26

### II.  KOLLER FAILS TO STATE A CLAIM FOR RELIEF

27

Koller claims that California's presidential-elector law violates (1) Article II and the

28

Twelfth Amendment, (2) the First Amendment, and (3) a federal statute prohibiting intimidation

of voters.  Am. Compl. ¶¶ 55–89.  On each count, Koller fails to state a claim on which relief can be granted.

### A.  Courts Have Already Rejected Koller's Claims As Meritless

In the aftermath of the 2016 presidential election, the Ninth Circuit and Western District of Washington both ruled in *Chiafalo v. Inslee* that challenges to state faithless-elector laws lack merit.  The Western District of Washington began by ruling that the electors "demonstrated neither a likelihood of success on the merits … nor serious questions going to the merits of their claims."  2016 WL 7243752, at *2 (Dec. 15, 2016).  The Ninth Circuit then agreed that the electors could show neither "a likelihood of success" nor "serious questions" on the merits.  Ex. B. at 1.

Courts outside this Circuit reached similar conclusions. In *Baca v. Hickenlooper*, the District of Colorado ruled that the would-be faithless electors "d[id] not have a substantial likelihood of prevailing on the merits of their claim."  2016 WL 7384286, at *3.  The Tenth Circuit agreed that the electors "failed to establish a likelihood of success on the merits."  Ex. A at 13.  So too, finally, in *Abdurrahman*, the District of Minnesota ruled that a plaintiff challenging a faithless-elector law "ha[d] not met his burden that he is likely to succeed on the merits."  2016 WL 7428193, at *4.

This Court should follow the teachings of its sister courts.  In particular, since the Ninth Circuit has already ruled that challenges to faithless-elector laws do not even raise a serious question on the merits, it would be inappropriate for a district court to conclude that the challenges are meritorious after all.

### B.  The Article II and Twelfth Amendment Claims Are Meritless

Koller's principal claim is that Article II and the Twelfth Amendment prohibit California from binding its electors.  This claim — which contravenes Supreme Court precedent, calls into question an Act of Congress and statutes in a majority of states, and contradicts centuries of tradition — is incorrect.

### 1. Precedent Establishes That States May Bind Electors

Multiple precedents, from both the Supreme Court and lower courts, establish that States have the power to enact laws binding their electors.

**a.**   *Ray v. Blair*, 343 U.S. 214 (1952) — in which the Supreme Court upheld a rule requiring electors to pledge to vote for their party's nominees — controls this case. *Blair*, to be sure, involved the *making* rather than the *enforcement* of a pledge.  A federal court, however, is "bound by the theory or reasoning underlying a Supreme Court case, not just by its holding." *Witt v. Dept. of Air Force*, 527 F.3d 806, 818 (9th Cir. 2008).  The reasoning of *Blair* confirms that states may require electors not only to make pledges but also to honor them:

- *Blair* rejected "the argument that the Twelfth Amendment demands absolute freedom for the elector to vote his own choice."  343 U.S. at 228.  This Court should reject the same argument here.

- *Blair* reasoned that nothing in "the language" of the Twelfth Amendment prohibits requiring electors to make pledges.  *Id.* at 225.  By the same token, nothing in the Amendment's language prohibits requiring electors to fulfill those pledges.

- *Blair* reasoned that "[s]urely one may voluntarily assume obligations to vote for a certain candidate."  *Id.* at 230.   Koller here "voluntarily assumed" his obligation to vote for his party's nominees when he willingly accepted appointment as an elector.

- *Blair* emphasized the "longstanding practice" of appointing electors "simply to register the will of the [People] in respect of a particular candidate."  *Id.* at 228–29 & n.16.  The Court added that states generally "do not [even] print the names of the candidates for electors on the general election ballot," but instead "allow a vote for the presidential candidate … to be counted as a vote for his party's nominees in the electoral college."  *Id.* at 228.  If "longstanding practice" showed that the Constitution does not grant electors a federal right to vote as they please in *Blair* (decided over 60 years ago), it shows the same thing here.

All in all, the Supreme Court's reasons for upholding laws requiring electors to make pledges apply equally to laws requiring electors to fulfill those pledges.  Judges and scholars alike recognize as much.  *See, e.g.*, *Gelineau v. Johnson*, 904 F. Supp. 2d 742, 745 (W.D. Mich. 2012) ("Though the [*Blair*] Court was not in a position to decide whether the pledge was ultimately enforceable, the opinion's reasoning strongly suggested that it would"); *Baca*, 2016 WL 7384286, at *3 ("*Blair* suggests that the state may … set requirements for presidential electors, and in the event they fail to conform to the state's statutory mandate, the state is permitted to take some remedial action, such as removal of the electors"); *Chiafalo*, 2016 WL 7243752, at *3 ("Although it does not squarely address the issue, [*Blair*] implies that the Supreme Court does not consider Article II and the Twelfth Amendment to 'deman[d] absolute freedom for the elector to vote his own choice'"); *Abdurrahman*, 2016 WL 7428193, at *4 ("*Blair* also implied that … enforcement [of pledges] would be constitutional"); Beverly J. Ross & William Josephson, *The Electoral College and the Popular Vote*, 12 J.L. & Politics 665, 696 (1996) ("[T]he Court's language and reasoning in *Ray v. Blair* strongly imply that state laws directly binding electors to a specific candidate are constitutional").  *Blair* is thus decisive here.

     **b.**   Quite apart from *Ray v. Blair*, the Constitution provides that "[e]ach State shall appoint, *in such manner as the Legislature thereof may direct*, a number of Electors."  U.S. Const. art. II, § 1, cl. 2 (emphasis added).  The Supreme Court has emphasized that this constitutional power is "plenary" (*McPherson v. Blacker*, 146 U.S.1, 25 (1892)), "comprehensive" (*id.* at 27), and "exclusive" (*id.* at 36).  The Court has stated that the Constitution grants states "the broadest power of determination."   *Id.* at 27.  And it has reaffirmed that "[t]here is no doubt" about the "plenary" "right of the legislature" to "select the manner for appointing electors."  *Bush*, 531 U.S. at 104.

     Faithless-elector laws fall squarely within the scope of the state's plenary, comprehensive, and exclusive power to decide the manner of appointing electors.  For one thing, the power to appoint includes the power to appoint subject to particular conditions.  *Cf. South Dakota v. Dole*, 483 U.S. 203, 206 (1987) (Congress's power to spend money includes power to spend money

subject to conditions); *Schick v. Reed*, 419 U.S. 256, 261 (1974) (President's power to pardon includes power to pardon subject to conditions); *Beers v. Arkansas*, 20 How. 527, 529 (1857) (state's power to waive sovereign immunity includes power to waive immunity subject to conditions).  Here, California has simply made it a condition of becoming an elector that the elector vote for his party's nominee.

For another thing, California's faithless-elector law is one element of a scheme for appointing presidential electors under which voters cast ballots linked to particular presidential candidates, not merely to particular electors.  To be sure, a state legislature could establish a system under which electors run under their own names, conduct their own campaigns, and ultimately vote their own consciences.  But a state legislature may also establish a system under which electors run under the names of the presidential candidates, piggyback on the campaigns of those candidates, and ultimately vote for the candidates under whose banner they ran.  The latter system is just as much a "manner" of appointing electors as the former.  *See* Ross & Josephson, 12 J.L. & Politics at 678 ("The states' constitutional power to appoint electors would appear to include the power to bind them").

**c.**  More broadly, the Supreme Court has held that electors are *state* officials who act by *state* authority.  Electors "are no more officers or agents of the United States than are the members of the state legislatures" (*In re Green*, 134 U.S. 377, 379 (1890)), "are not officers or agents of the federal government" (*Burroughs v. United States*, 290 U.S. 534, 545 (1934)), and "are not federal officers or agents" (*Blair*, 343 U.S. at 224).  Electors "act by authority of the state that it in turn receives its authority from the federal constitution."  *Id.*

This characteristic of electors confirms that states may require them to vote in accordance with state law.  In "our federal system," states "retain autonomy" to control "their own governmental processes."  *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2673 (2015).  Indeed, the power to control "those who exercise [state] authority" is a "fundamental" attribute of state sovereignty.  *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991)).

These principles establish that a state legislature may enact state laws regulating how electors — state officials — exercise state authority when casting the state's electoral votes.

**d.**   Precedent from state courts confirms that states may bind electors.   For example, in *Spreckels v. Graham*, 228 P. 1040, 1045 (Cal. 1924), the Supreme Court of California held that the "sole function" of electors is "to cast, certify, and transmit a vote already predetermined." Electors do not "exercise judgment or discretion in the slightest degree"; they "are in effect no more than messengers whose sole duty it is to certify and transmit the election returns." *Id.*   The court added that the elector's duty to "represent the preferences" of the People was (even by 1924) "so long established" that it constitutes "part of [California's] unwritten law." *Id.*

Similarly, in *Thomas v. Cohen*, 262 N.Y.S. 320, 326 (1933), a New York court held that the State's electors had a common-law "duty" "to choose the nominee of the party they represent, and no one else."   The court added that "[t]he elector who attempted to disregard that duty could … be required by mandamus to carry out the mandate of the voters of his state," since an elector's functions "are purely ministerial."   *Id.*   The court rejected the notion that "electors have a [constitutional] right to defy the will of the people," reasoning that any such claim contradicted "the established practice in the states."   *Id.* at 331.

Finally, in *State v. Wait*, 138 N.W. 159 (Neb. 1912), the Supreme Court of Nebraska held, as a matter of state common law, that elector candidates automatically lose their places on their party's slate if they announce that they will not vote for the party's presidential nominee.   The court reasoned that "persons who have been nominated as presidential electors, hav[e], if elected, but a single duty to perform, *viz.*, to vote for the candidates nominated by the party." *Id.* at 163. If the elector candidates "openly declare that they will not perform that duty," they "vacat[e] their places as … presidential electors" and "ipso facto creat[e] vacancies on the [party's] ticket for electors."   *Id.*   The court's holding that electors have a legal "duty" to vote in accordance with their pledges further underscores the constitutionality of the law challenged here.

15

1

2   **2.  Original understanding confirms that states may bind electors**

3       The Electoral College today is governed by the Twelfth Amendment, which "materially

4   chang[ed] the mode of election of president" established by Article II.  3 Joseph Story,

5   *Commentaries on the Constitution of the United States* § 1460 (1833).  Whatever may have been

6   the original understanding of Article II in 1789, the original understanding of the Twelfth

7   Amendment in 1804 defeats any claim that electors enjoy a constitutional right to vote for

8   whomever they please.

9       Congress proposed and the states ratified the Twelfth Amendment with the understanding

10  that electors are ministerial agents who represent their parties' nominees, rather than platonic

11  guardians who exercise independent judgment.  "In the [very] first election held under the

12  constitution," the people "looked beyond [the electors], fixed upon their own candidates for

13  President and Vice President, and took pledges from the electoral candidates to obey their will."

14  *Blair*, 343 U.S. at 228 n.15 (quoting S. Rep. No. 22, 19th Cong., 1st Sess., at 4 (1826)).  From

15  1796 on, presidential aspirants ran as "regular party candidates," and the party's electors were

16  "expected to support" them.  *Id.* at 228 n.16.  When Federalist elector Samuel Miles violated his

17  pledge in to vote for John Adams in 1796, an indignant voter published in a newspaper: "What!

18  Do I chuse Samuel Miles to determine for me whether John Adams or Thomas Jefferson shall be

19  President?  No!  I chuse him to *act*, not to *think*."  Edward Stanwood, *A History of the Presidency

20  from 1788 to 1897*, at 51 (1898).  By 1802, everyone understood that "the people do not elect a

21  person for an elector who, they know, does not intend to vote for a particular person as

22  President."  11 Annals of Congress 1289–90 (1802).  The reality that Congress proposed and the

23  states ratified the Twelfth Amendment against this historical backdrop defeats any claim that the

24  People understood the Amendment to protect an elector's right to vote as he pleases.

25      In fact, the whole purpose of the Twelfth Amendment was to accommodate these political

26  realities of presidential elections.  Under the original Constitution, "the electors … did not vote

27  separately for President and Vice-President; each elector voted for two persons, without

28  designating which office he wanted each person to fill."  *Blair*, 343 U.S. at 224 n.11.  That system

16

may have worked in a world where electors exercised independent judgment, but it broke down once electors came merely to represent their parties' presidential and vice presidential nominees. For example, the election of 1800 ended in a tie because Democratic-Republican electors had no way to distinguish between presidential nominee Thomas Jefferson and vice-presidential nominee Aaron Burr when they each cast two votes for President.  These problems prompted the Twelfth Amendment, which provided that electors must cast "distinct ballots" for President and Vice President.  The whole point of this new procedure (as the Supreme Court has recognized) was to ensure that "[e]lectors could be chosen to vote for the party candidates for both offices, and electors could carry out the desires of the people, without confronting the obstacles which confounded the [election of 1800]."  *Id.*; *see also* 11 Annals of Congress 1289–90 (1802) (explaining that "the very thing . . . intended by this amendment" was to facilitate the practice of voting for electors pledged "to vote for a particular person as President") (cited in *Blair*, 343 U.S. at 224 n.11).  This history defeats Koller's Article II and Twelfth Amendment claims here.

### 3.  Longstanding Practice Confirms That States May Bind Electors

"[L]ong settled and established practice" deserve "great weight" in constitutional interpretation.  *NLRB v. Noel Canning*, 134 S. Ct. 2550, 2559 (2014); *see, e.g.*, *Blair*, 343 U.S. at 228 (emphasizing "longstanding practice").  Practice validates the law challenged here.

States.  By one count, at least 29 state legislatures have enacted faithless-elector laws.  *See* S. Doc. No. 111-15, at 346–434 (2010).  Moreover, some state courts have concluded as a matter of state common law that electors have a duty to fulfill their pledges.  *Supra* 13–14.  Koller's theory would require this Court to invalidate all of these statutes and state-court decisions.

Congress.  Months after ratification of the Twenty-third Amendment — which authorizes the District of Columbia to vote in presidential elections — Congress enacted a statute requiring the District of Columbia's electors to vote as pledged.  The statute provides: "Each person elected as elector [for the District of Columbia] shall … take an oath or solemnly affirm that he will vote for the candidates of the party he has been nominated to represent, *and it shall be his duty to vote*

17

*in such manner in the electoral college*." 75 Stat. 819 (emphasis added). Koller's theory would require holding this Act of Congress unconstitutional.

The People. From the beginning of the Republic, electors have been chosen on the understanding that they will vote for a particular presidential candidate. Justice Story thus explained (3 *Commentaries* § 1457):

> [E]lectors are now chosen wholly with reference to particular candidates … The candidates for the presidency are selected and announced in each state long before the election; and an ardent canvass is maintained in the newspapers, in party meetings, and in the state legislatures, to secure votes for the favourite candidate, and to defeat his opponents. . . . [N]othing is left to the electors after their choice, but to register votes, which are already pledged; and an exercise of an independent judgment would be treated, as a political usurpation, dishonourable to the individual, and a fraud upon his constituents.

Presidential elections work much the same way today. Koller's theory would require this Court to replace a two-century-old system under which the vote of the People is decisive, and the vote of the electors a formality, with a system under which the vote of the electors is decisive, and the vote of the People a formality.

**C. The First Amendment Claim Is Meritless**

Koller also asserts that the First Amendment protects electors' right to vote as they please. This claim, too, is meritless.

*First*, the specific governs the general in constitutional interpretation. If a particular Amendment addresses "a particular sort of government behavior," "that Amendment," not a "more generalized notion" found elsewhere in the Constitution, "must … guide" the court's analysis of the claims. *Graham v. Connor*, 490 U.S. 386, 395 (1989). For example, a court should analyze claims concerning the constitutional propriety of copyrights under the Copyright Clause, and should reject "attempt[s] to win under the banner of the First Amendment what they could not win under the Copyright Clause." *Golan v. Holder*, 132 S. Ct. 873, 891 (2012). Here, Article II and the Twelfth Amendment include specific provisions concerning the selection of electors and the operation of the Electoral College. Those specific provisions, not the more

18

general terms of the First Amendment, should guide the Court's analysis here.  And as just shown, those specific provisions allow States to bind electors' votes.

*Second*, the Supreme Court has "rejected the notion that the First Amendment confers a right to use governmental mechanics to convey a message."  *Nev. Ethics Comm'n v. Carrigan*, 564 U.S. 117, 127 (2011); *see also Garcetti v. Ceballos*, 547 U.S. 410, 421–22 (2006) ("Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any [First Amendment] liberties").  For example, "a legislator's vote" is "not … protected speech," since "a legislator has no right to use official powers for expressive purposes." *Carrigan*, 564 U.S. at 125–27.  "In this respect, voting by a legislator is different from voting by a citizen."  *Id.* at 126.  Similarly, a prosecutor's memo does not amount to protected speech, since the prosecutor makes the statements in the memo "pursuant to [his] official duties."  *Garcetti*, 547 U.S. at 421.  The same principles that govern a legislator's vote or a prosecutor's memo also govern an elector's vote.  Like a legislator, an elector is a government official; like the legislature, the Electoral College forms a part of the mechanics of government; and like a legislator's vote, an elector's vote constitutes an exercise of official power.  Thus, like a legislator, an elector has no personal constitutional right to use the electoral vote entrusted to him to convey a message.  *See Chiafalo*, 2016 WL 7243752, at *3 (rejecting electors' First Amendment claim because "[r]elevant legal authority … limits the context in which the First Amendment protects individuals performing their official, governmental duties").

*Third*, conduct qualifies as speech protected by the First Amendment only if it is "inherently expressive."  *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 66 (2006).  An elector's vote is not inherently expressive.  To the contrary, it is "purely ministerial."  *Thomas*, 262 N.Y.S. at 326.  Indeed, California's electors in particular "are in effect no more than messengers whose sole duty it is to certify and transmit election returns," and "they have no duties to perform which involve the exercise of judgment or discretion in the slightest degree."  *Spreckels*, 228 P. at 1045.  An elector's exercise of this mundane and ministerial function does not constitute inherently expressive conduct entitled to First Amendment

19

protection.  *See Baca*, 2016 WL 7384286, at *4 (rejecting electors' First Amendment claim because "electors perform ministerial duties, which are merely formal in nature); *Chiafalo*, 2016 WL 7243752, at *3 (rejecting electors' First Amendment claim because "[r]elevant legal authority characterizes electors' role as 'ministerial'").

*Fourth*, the Supreme Court has held that states may "requir[e] those making promises [to speak or refrain from speaking] to keep them."  *Cohen v. Cowles Media Co.*, 501 U.S. 663, 672 (1991).  This holding rests on the premise that "a party's voluntary promise [to speak or not to speak] constitute[s] a valid waiver of First Amendment rights."  *Yoder v. Univ. of Louisville*, 526 F. App'x 537, 547 (6th Cir. 2013).  Here, Koller waived any First Amendment rights he may have had in his electoral vote when he voluntarily accepted the obligations associated with becoming an elector.  The First Amendment allows California to require him to keep this promise.  *See Baca*, 2016 WL 7384286, at *4 ("[T]he presidential electors waived their First Amendment rights when they accepted the nomination to be presidential electors"); *Chiafalo*, 2016 WL 7243752, at *3 ("Plaintiffs chose to stand for nomination as an elector for their party, subject to the rules and limitations that attend the position").

*Fifth*, California's statute satisfies the applicable constitutional standard of review.  Courts review restrictions upon the electoral process by weighing "the character and magnitude of the asserted injury" against the "interests put forward by the State."  *Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *see also Baca*, 2016 WL 7384286, at *3 n.1 ("[T]he Supreme Court expressly rejected the application of strict scrutiny to a challenge of state election laws, which is really what this case is, in favor of a more flexible standard").  The "asserted injury" here is insignificant (if it even exists), both because Koller voluntarily assumed the obligations associated with becoming an elector and because an elector performs a purely ministerial function when casting an electoral vote.  California, in contrast, has weighty interests in ensuring that electors reflect the will of the People as expressed in a democratic election.

*Finally*, even if this Court were to apply strict scrutiny rather than the balancing test established by *Burdick*, California's statute would still survive.  "A State indisputably has a

20

compelling interest in preserving the integrity of its election process." *Eu v. San Francisco County Democratic Central Comm.*, 489 U.S. 214, 231 (1989). A State also has "an important interest — indeed, a compelling one — in securing the People's right to self-government." *Chula Vista Citizens for Jobs & Fair Competition v. Norris*, 782 F.3d 520, 531 (9th Cir. 2015). California's faithless-elector law promotes this interest by preventing electors from perpetrating "political usurpations" and "fraud[s] upon [their] constituents." 3 Story, Commentaries § 1457. To paraphrase the District of Minnesota: "[Californians] have an interest in their votes counting. If [Koller were allowed to disregard their votes], this would essentially reduce the votes cast by the [California] electorate. Such harm on the citizens of [California] is much greater than any harm suffered by an elector who ignored his pledge to those citizens." *Abdurrahman*, 2016 WL 7428193, at *4.

### D. Koller's Statutory Claim Is Unlikely To Succeed

Koller asserts, last of all, that California's presidential elector statute violates 18 U.S.C. § 594, which prohibits intimidating "any other person for the purpose of interfering with the right of such other person to vote … for the office of President, Vice President, Presidential elector, Member of the Senate, [or] Member of the House of Representatives." This claim, too, lacks merit.

In the first place, Koller fails to establish that this statute protects presidential electors (as opposed to ordinary voters). The statute protects only individuals who hold a "right … to vote." The phrase "right … to vote … [for] President" is naturally read to include the right of an ordinary voter to cast a ballot for President on election day. *See, e.g.*, *Bush*, 531 U.S. at 103 ("an estimated 2% of ballots cast do not register a vote for President"); *id.* at 104 ("When the state legislature vests the right to vote for President in its people …."); *Hall v. Beals*, 396 U.S. 45, 52 (1969) ("Colorado's requirement that in order to vote for President and Vice President, one must … be a resident of that State …."); *see also* 26 U.S.C. § 9011 (authorizing "individuals eligible to vote for President" to bring lawsuits under federal campaign-finance laws). In contrast, the phrase "right … to vote … [for] President" does not comfortably cover an elector's

21

exercise of the ministerial function of casting a ballot.  As just shown, an elector does not have a constitutional "right" to vote for President.

In addition, even assuming that § 594 protects presidential electors, Koller fails to establish that it covers action by state *governments* (as opposed to action by private citizens).  The statute applies only to a "person" who "coerces" a protected individual, and the Supreme Court has held that "neither a State nor its officials acting in their official capacities are 'persons.'"  *Will v. Mich. Dept. of State Police*, 491 U.S. 58, 71 (1989).  Furthermore, courts read a federal statute to interfere with a state's regulation of "those who exercise [state] authority" only if Congress's intention to do so is "unmistakably clear in the language of the statute."  *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991).  Section 594 does not include "unmistakably clear" language expressing Congress's intention to restrict a State's regulation of its own electors.

Moreover, § 594's verbs — "intimidates, threatens, coerces" — do not cover the operation of a state statute.  Courts must interpret statutes in light of "the principle of *noscitur a sociis* — a word is known by the company it keeps — to 'avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the Acts of Congress.'"  *Yates v. United States*, 135 S. Ct. 1074, 1085 (2015) (plurality opinion).  Read in tandem, "intimidate," "threaten," and "coerce" all connote extralegal and even violent action; they are not sensibly read to encompass the ordinary operation of the legal process.  The Act of Congress that binds the District of Columbia's electors (75 Stat. 819) underscores the illogic of Koller's reading.  It makes little sense to think that Congress "intimidated" District of Columbia voters, in violation of its own voter-intimidation statute, when it enacted this law.

In all events, courts must read federal statutes to avoid raising constitutional doubts.  *Crowell v. Benson*, 285 U.S. 22, 62 (1932).  The Constitution vests power over the appointment of electors "exclusively" in state legislatures; "congressional and federal influence [are] excluded."  *McPherson*, 146 U.S. at 35.  Koller's interpretation of § 594 raises serious constitutional doubts, since it would interfere with the state legislature's exercise of this "exclusive" power.  That is reason enough to reject it.

22

1

\*　　　　　　\*　　　　　　\*

2

This lawsuit strikes at the heart of the process that the American people have long used to

3

select their President.  For two centuries, Americans have gone to the polls in November with the

4

expectation that their votes count and that presidential electors will carry out their will.  For an

5

elector to disregard that duty after pledging to carry out would be "unexpected and destructive of

6

order in our land."  *Thomas*, 262 N.Y.S. at 326.  Allowing electors to do so as a matter of course

7

would undermine "political stability," the "legitimacy of the eventual winner," and "the

8

expectations of the American people."  *Baca*, 2016 WL 7384286, at \*6.

9

Because this Court does not have jurisdiction over this case and Koller's Amended

10

Complaint fails to state a claim upon which relief could be granted, the Court should dismiss the

11

Amended Complaint.

12

Dated:  March 31, 2017.                                     Respectfully submitted.

13

**BELL, McANDREWS & HILTACHK, LLP**

14

15

BY: _____

16

CHARLES H. BELL, JR.
BRIAN T. HILDRETH

17

TERRY J. MARTIN

18

Attorneys for Intervenor
CALIFORNIA REPUBLICAN PARTY

19

20

21

22

23

24

25

26

27

28

INTERVENOR CALIFORNIA REPUBLICAN PARTY'S MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED
COMPLAINT